# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NEIL SMITH and NTS, LLC, )
)
   Plaintiffs/Counterclaim Defendants, )
)
    v. ) C.A. No. 11255-VCG
)
PROMONTORY FINANCIAL GROUP, )
LLC, a Delaware limited liability )
company and PROMONTORY )
GROWTH AND INNOVATION, LLC, a )
Delaware limited liability company, )
)
   Defendants/Counterclaim Plaintiffs. )

## MEMORANDUM OPINION

Date Submitted: January 9, 2019
Date Decided: April 30, 2019

David A. Jenkins and Laurence V. Cronin, of SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Bruce E. Jameson and Eric J. Juray, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Robert M. Cary, Alexander S. Zolan, and Robert M. Belden, of WILLIAMS & CONNOLLY LLP, Washington, District of Columbia, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves the withdrawal of a member from an LLC, which (per the *de facto* LLC agreement) entitles him to a percentage of the value of the LLC's business, as of the time of withdrawal, as valued without the continuing services of that member. This post-trial Memorandum Opinion, then, necessarily involves a valuation exercise. Arriving at a valuation is complicated here by several factors. First, the withdrawing member, Neil Smith, was essentially a key man of the business, so the effect of the loss of his services is large. Next, the entity's unusual business model was to provide consulting services to large enterprises in a way that, the parties explain, would need to be done only once; therefore, repeat business was not a factor. Developing clients, in essence, resembled a kind of mining or hunting operation; like game, clients were bagged but once. Clients, moreover, were available sporadically and fortuitously; akin, according to the Plaintiffs, to finding the proverbial "needle in a haystack." Perhaps due to all these factors, the short life of the business was marked by highly variable successes; the game bagged was episodic, variable in size, and included one enormously profitable unicorn. These factors create a difficult entity on which to make revenue projections, and thus, I find, preclude a reliable cash flow analysis.

Fortunately for the completion of my task here, the parties did negotiate a buyout of a portion of the Plaintiff's equity shortly before his withdrawal. The parties dispute whether the buyout was consummated. I find it was not. It is,

however, useful evidence for valuation purposes. The results of my valuation, as well as the value of an offsetting claim demonstrated by the Defendants, are below, preceded by the facts as found post-trial.

## I. BACKGROUND

This is a post-trial Memorandum Opinion. The following facts were stipulated by the parties or proven by a preponderance of evidence at trial.

*A. The Parties*

Plaintiff Neil Smith ("Smith") is a resident of New York.[1] He was one of two members of Defendant Promontory Growth and Innovation, LLC ("PGI"), a Delaware limited liability company.[2] Smith co-founded PGI, and then assigned his membership interest in PGI to Plaintiff NTS, LLC ("NTS").[3] NTS is a New York limited liability company and is wholly owned by Smith.[4]

Defendant PGI was formed "to provide management consulting services to enhance the earnings and all-around business performance of financial service and other companies."[5] PGI's other member (besides Smith/NTS) is Defendant Promontory Financial Group, LLC ("Promontory"), a Delaware limited liability company.[6] Promontory was founded by Eugene Ludwig ("Ludwig"), who serves as

---

[1] Joint Pre-Trial Stipulation and Order [hereinafter, "PTO"] ¶ 10.
[2] *Id.*
[3] *Id.* ¶ 11.
[4] *Id.*
[5] *Id.* ¶ 15; *see also* JX 16, at 1.
[6] PTO ¶ 13.

its chief executive officer.[7]  Ludwig co-founded PGI with Smith; thereafter, Ludwig assigned his membership interest in PGI to Promontory.[8]

*B. Smith and Ludwig Form PGI*

1. <u>Smith and Ludwig Meet and Agree to Form PGI</u>

Before co-founding PGI, Smith worked for EHS Partners, LLC ("EHS").[9] Smith has made a career of providing management consulting services, including while employed at EHS, with a focus on profit-improvement projects.[10]  Ludwig, who previously served as the United States Comptroller of the Currency,[11] founded Promontory, a global advisory firm focused on financial services.[12]  Ludwig first met Smith when Smith worked for EHS; at that time Ludwig helped introduce EHS to potential clients.[13]  Promontory first explored a joint venture with EHS.[14] However, negotiations with EHS failed, and instead Smith left EHS and formed PGI with Ludwig.[15]

Smith and Ludwig signed a Letter of Intent (the "Letter of Intent") in order to form PGI,[16] according to which PGI's goal was "to provide management consulting

---

[7] *Id.* ¶ 14.
[8] *Id.*
[9] *Id.* ¶ 12.
[10] Trial Tr. 115:19–116:24, 117:12–123:7 (Smith).
[11] *Id.* at 264:14–265:9 (Ludwig).
[12] *Id.* at 266:8–11, 266:12–24 (Ludwig).
[13] *Id.* at 21:14–22:3 (Smith); *id.* at 272:9–273:20 (Ludwig).
[14] *Id.* at 23:5–24:5 (Smith); *id.* at 479:15–480:6 (Moses); *see also* JX 8, at 1–3.
[15] Trial Tr. 24:1–15 (Smith); *id.* at 479:19–480:16 (Moses).
[16] JX 16.

services to enhance the earnings and all-around business performance of financial service and other companies."[17] Ludwig considered Smith to be an expert in the profit improvement field,[18] and Smith considered Ludwig to be a potential "rainmaker," given his extensive contacts at financial institutions.[19] According to Smith, PGI's business model had three steps.[20] First, "finding CEOs to meet;" second, "closing the deal once you've met that CEO;" and third, "actually doing the deal."[21] The "deal" was Smith's process of harvesting ideas for improvement from a client's own employees, and then advising the client on how to implement those ideas.[22]

Per Smith, PGI was a "partnership made in heaven,"[23] a sentiment Ludwig seemed to share.[24] Ludwig knew the CEOs of many financial services companies,[25] personally helped to pitch PGI,[26] and had Promontory personnel market PGI's services whenever possible.[27] Smith's expertise in the profit improvement field was

---

[17] *Id.* at 1.
[18] Trial Tr. 277:12–278:4 (Ludwig).
[19] *Id.* at 22:20–22, 29:17–30:11 (Smith).
[20] *Id.* at 29:3–29:4 (Smith).
[21] *Id.* at 29:4–7 (Smith).
[22] *Id.* at 29:17–23 (Smith). This process was the same Smith had helped develop at his previous employments, including at EHS. *Id.* at 116:1–123:7 (Smith).
[23] *Id.* at 30:7 (Smith).
[24] *Id.* at 285:10–286:19 (Ludwig).
[25] *Id.* at 22:20–23:4 (Smith); *id.* at 412:6–414:4 (Ludwig).
[26] *See, e.g.*, *id.* at 310:7–314:3, 315:24–320:14, 321:2–322:2 (Ludwig); JX 26; JX 31; JX 32; JX 39; JX 55.
[27] *See, e.g.*, Trial Tr. 174:11–176:9 (Smith); *id.* at 279:14–280:14, 315:14–23, 324:17–325:19 (Ludwig); JX 96.

important to getting clients to sign on,[28] and, of course, was critical to PGI actually performing projects for clients.

Smith negotiated the Letter of Intent with Alfred Moses ("Moses"),[29] Promontory's Chief Operating Officer.[30] Smith and Ludwig then signed the Letter of Intent in May 2009.[31] However, Smith and Ludwig were subsequently unable to negotiate a formal operating agreement for PGI.[32] In April 2010, NTS and Promontory (Smith and Ludwig had, by then, transferred their membership interests in PGI to NTS and Promontory, respectively) agreed in writing that the Letter of Intent would serve as PGI's operating agreement.[33] The rudimentary nature of this improvised operating agreement has led to difficulties in this litigation.

2. Terms of the Letter of Intent

According to the Letter of Intent, Promontory would provide working capital advances to PGI to pay expenses PGI incurred in advance of receiving revenue.[34] The amount of working capital advances was estimated, at the time the Letter of Intent was signed, to be $3 million, prorated over twenty-four months.[35] PGI was

---

[28] Trial Tr. 133:2–19, 150:16–23 (Smith); *id.* at 329:16–330:7 (Ludwig).
[29] *See, e.g.*, JX 13; JX 14; JX 15.
[30] Trial Tr. 269:6–9 (Ludwig); *id.* at 478:23–479:1 (Moses).
[31] PTO ¶ 16. Smith signed on May 11, 2009 and Ludwig on May 14, 2009. JX 16, at 4.
[32] PTO ¶ 17.
[33] *Id.*; JX 40.
[34] PTO ¶ 18.
[35] *Id.*

5

obligated to repay Promontory for those working capital advances.[36]  After PGI had

repaid Promontory's working capital advances and repaid operating costs, PGI could

make distributions to its members.[37]  However, PGI could, under certain

circumstances, make distributions to Smith that totaled less than $1 million in a

given year if PGI had enough revenue to make a distribution to Smith from its

operating revenues, and if at least half of the working capital advances from

Promontory had been repaid.[38]  Smith was also entitled to a "non-refundable draw

of $500,000 per year (prorated) charged to his economic interest."[39]

The Letter of Intent gave Smith and Ludwig each a fifty percent economic

interest in PGI.[40]  Pursuant to the Letter of Intent, Smith had the right to withdraw

from PGI.[41]  If Smith withdrew after "three years from the date [PGI] commences

its first engagement,"[42] then Smith was entitled to receive "over a period not to

exceed 5 years 50% of the then going business value of [PGI] minus [Smith's]

services, the value to be decided between the parties at the time thereof."[43]  The

Letter of Intent did not state who would pay Smith this amount.[44]  By comparison,

---

[36] *Id.*
[37] *Id.* ¶ 19.
[38] *Id.*
[39] JX 16, at 1.
[40] PTO ¶ 19.
[41] *Id.* ¶ 31.
[42] JX 16, at 3. This is the definition of the "Three-Year Date" in the Letter of Intent.  *Id.*
[43] PTO ¶ 31.  If Smith resigned before the three-year period or if Smith was terminated for cause, he would receive nothing for his economic interest in PGI.  JX 16, at 3–4.
[44] JX 16, at 4.

if Smith withdrew because of death or incapacity, Smith (or his estate) was entitled to receive from PGI a certain percentage of certain PGI operating profits.[45]

### 3. PGI's Management Structure

While Smith and Ludwig each held a fifty percent economic interest in PGI, Ludwig was given a sixty percent governance interest.[46] Smith held the remaining forty percent governance interest.[47] However, unanimous consent was required for certain actions, including entering engagements, incurring debt, employment decisions, and budget approval, among others.[48] Smith was made PGI's President and Chief Executive Officer ("CEO").[49] As a result, Smith was tasked with running the day-to-day business.[50] Smith began his tenure as CEO on August 11, 2009.[51] Ludwig was given the role of PGI's non-executive Chairman.[52]

*C. PGI's Operating History Under Smith*

### 1. PGI from May 2009 to August 2013

As mentioned, Smith and Ludwig signed the Letter of Intent in May 2009. PGI's began operations in August 2009.[53] Despite Smith and Ludwig's prominence,

---

[45] *Id.* at 3.
[46] PTO ¶ 20.
[47] *Id.*
[48] *Id.* ¶ 21.
[49] *Id.* ¶ 23.
[50] *Id.*
[51] *Id.* ¶ 30.
[52] *Id.* ¶ 22.
[53] *Id.* ¶ 30; *see also* JX 27, at 1 (e-mail sent on October 5, 2009: "This has been our first full month since we started . . . .").

PGI's business was sparse. PGI's services only appealed to companies of a certain size, and only a few of those companies would be open to a profit improvement project at any given time.[54] Moreover, the business was such that it did not generate returning customers; each customer required only a single application of PGI's services.[55] Landing an account required having a meeting with the right executive at the right time, something Smith described as "finding the needle in a haystack."[56] PGI worked on a contingency basis and charged as a fee a percent of the profit improvement of its client.[57]

PGI had no engagements in 2009.[58] In 2010, PGI had two engagements.[59] One was with the New York Stock Exchange, which resulted in total revenue of $278,000.[60] The New York Stock Exchange engagement was an "icon," and PGI performed the deal for little revenue, intending to reap reputational rewards instead.[61] The second engagement was with First National of Nebraska, which

---

[54] *See, e.g.*, Trial Tr. 182:16–18 (Smith) ("[A]t any one time, 20 of the Fortune 500 CEOs are in the business of doing this."); *id.* at 206:12–14 (Smith) ("It didn't necessarily have to be a big company. I mean, I think we're looking at top thousand.").

[55] *Id.* at 203:15–206:1, 206:18–20 (Smith).

[56] Trial Tr. 253:11–13 (Smith) ("Finding the CEO who was in the market at that moment in time was like finding the needle in the haystack."); *see also id.* at 230:19–23 (Smith) ("But, again, that referred to anything that was active at that time. That's finding -- finding a needle in the haystack is finding one of the 20 out of the 500 or 15 out of the 200 that's active."); JX 53, at 1.

[57] Trial Tr. 118:17–22, 257:13–15 (Smith); *id.* at 555:19–556:8 (Ketcham).

[58] PTO ¶ 25.

[59] *Id.* ¶ 26.

[60] *Id.*

[61] Trial Tr. 33:21–23, 187:2–17 (Smith).

resulted in total revenue of $5,810,053.[62]  PGI only had three engagements with Smith as CEO.[63]  The third engagement was with Bank of America; it started in May 2011 and ended in April 2012, and it resulted in total revenue to PGI of $137,500,345.[64]

PGI performed the Bank of American project together with EHS, and the firms had agreed to split the fee.[65]  As mentioned, PGI earned almost $138 million in revenue from the project, at least $120 million of which was profit.[66]  PGI distributed substantially all of its profits from the Bank of America project to PGI's members—NTS (Smith) and Promontory.[67]  The distribution of all the profits from the Bank of America engagement was, to an extent, inadvertent; Smith and Moses both mistakenly believed that PGI was actually retaining an amount sufficient to cover PGI's working capital for a period going forward.[68]

---

[62] PTO ¶ 26.

[63] *Id.* ¶ 24.

[64] *Id.* ¶ 27.

[65] Trial Tr. 192:3–193:13 (Smith).  Smith also received a portion of EHS's share of the fee because of an entitlement as a former member of EHS to certain trailing revenues.  *Id.* at 194:2–10 (Smith).

[66] PTO ¶ 27; Trial Tr. 194:11–22 (Smith); JX 92, at 3; JX 165, at 4.

[67] Trial Tr. 67:5–9, 68:17–72:5, 195:5–196:8 (Smith); *id.* at 530:6–13, 530:17–19 (Moses); JX 85, at 1; JX 442, at 1.

[68] Trial Tr. 70:5–7 (Smith) ("So I was trying to be prudent in keeping enough working capital in our account, while still making a sizable distribution to each of us."); *id.* at 71:3–7 (Smith) ("We actually did an analysis of it and, to this day, I still don't fully understand it. But there were certain payments in this which I hadn't taken into account, which I was unaware of at the time."); *id.* at 530:7–8 (Moses) ("I think Mr. Smith told me that he held back $5 million"); JX 85, at 1 (Smith writing to Moses on May 18, 2012: "Even before these funds I believe we have sufficient funds already in the account to last us at least until the end of 2013 without another deal."); JX 442, at 1 (Smith writing to Moses on April 4, 2012: "We currently have $92.2 million in our account.  I

9

Meanwhile, PGI's debt to Promontory continued to increase. In June 2012, PGI funded publication of a book written by Smith, "How Excellent Companies Avoid Dumb Things: Breaking The 8 Hidden Barriers That Plague Even The Best Businesses," which PGI ensured became a *New York Times* Bestseller.[69] Smith's book was intended to be a marketing tool for PGI, and copies were sent to numerous third-party executives.[70] At the end of 2012, PGI owed Promontory more than $5.4 million.[71] This included money Promontory loaned PGI for marketing (including publishing Smith's book and making it a bestseller)[72] and the monthly working capital advances provided by Promontory, which amounted to approximately $300,000 per month.[73]

In early 2013, Moses raised with Smith the need to repay PGI's debt to Promontory.[74] As an indirect 50% owner of PGI, Smith was personally responsible

---

believe we can safely make a distribution of $85 million ($42.5 million each) and still leave 2 years [sic] worth of working capital in the account.").

[69] PTO ¶ 29.

[70] Trial Tr. 46:2–11, 46:22–23 (Smith).

[71] *Id.* at 241:6–11 (Smith); JX 130, at 3.

[72] PGI hired a company which guaranteed placement of a book on the *New York Times* bestseller list through purchasing copies of the same book. Trial Tr. 45:15–16 (Smith).

[73] Trial Tr. 241:6–11 (Smith); JX 130, at 3. Promontory agreed to PGI's budgeting of $1 million to support Smith's book. Trial Tr. 213:17–214:9 (Smith); Trial Tr. 298:6–21 (Ludwig). The majority of PGI's working capital was payroll. Trial Tr. 241:10–11 (Smith). PGI had hired several additional employees after its founding, including three employees around when PGI performed the Bank of America deal. Trial Tr. 51:16–57:12, 71:22–24 (Smith). As a result, PGI's estimated monthly working capital needs had increased to $300,000 per month, more than double the estimated $125,000 per month envisioned in the Letter of Intent ($3,000,000 prorated over twenty-four months).

[74] Trial Tr. 72:6–15 (Smith); *id.* at 496:21–497:14 (Moses); JX 113.

for half of the debt. Smith conveyed to Moses his belief that PGI would soon receive another project and could therefore repay Promontory from incoming revenue.[75] Smith recommended to Moses that PGI and Promontory revisit the issue of repayment in April 2013, if new projects had not materialized by then.[76] Moses, it appears, agreed.[77]

From May 2012 until August 18, 2013, PGI did not work any additional engagements and earned no revenue.[78] On August 18, 2013, more than three years after PGI started its first engagement, Smith resigned as both president and CEO.[79] The circumstances of that resignation are described below.

### 2. PGI's Long Term Projections

Beginning in 2012, Promontory began to prepare long term financial projections for the entire organization, which included Promontory's interest in PGI.[80] Promontory's then-Chief Financial Officer, Michael Ketcham, and another Promontory employee, David Meschke, were involved in creating Promontory's long-term projections.[81] The initial purpose of the projections was to explore a

---

[75] Trial Tr. 72:6–23 (Smith); JX 113.
[76] Trial Tr. 73:3–9 (Smith); JX 113.
[77] Trial Tr. 496:21–498:14 (Moses).
[78] PTO ¶ 28.
[79] *Id.* ¶ 30.
[80] Trial Tr. 556:9–16 (Ketcham); *id.* at 567:15–24 (Meschke); JX 70.
[81] Trial Tr. 61:6–11 (Smith); *id.* at 566:20–567:17 (Meschke); JX 428.

potential sale of Promontory,[82] the projections were also used to expand Promontory's debt financing relationships.[83]

Starting on February 23, 2012, Ketcham asked Smith to provide projections for PGI.[84] Smith had no prior experience making financial projections.[85] Smith also told Ketcham that PGI's business was hard to project.[86] Ludwig and Moses similarly held a sentiment that long term projections were not good indicators of Promontory's business generally, and they did not use them to manage Promontory.[87] According to the projections that Ketcham and Meschke developed based on Smith's guidance,[88] PGI was expected to conduct three deals in 2013, five in 2014, and then increase the number of deals each year by one until 2016, when PGI would have seven.[89] Each deal was expected to earn revenue of $10 million.[90] Smith explained at trial that he arrived at these numbers based on his experience at EHS and Tandon (where he had performed similar work).[91] Smith projected more than three deals for

---

[82] *See* Trial Tr. 303:1–3, 442:20–23 (Ludwig); JX 75; JX 80.
[83] JX 72, at 1.
[84] Trial Tr. 559:21–560:2 (Smith); JX 70, at 1; JX 72, at 1.
[85] Trial Tr. 255:15–17, 255:18–20 (Smith).
[86] *Id.* at 560:3–563:1 (Ketcham); *see also id.* at 183:12–184:3 (Smith).
[87] *Id.* at 300:15–302:1, 302:8–10 (Ludwig); *id.* at 490:19–492:11 (Moses).
[88] *See, e.g.*, JX 74, at 1; JX 76, at 1; JX 77, at 1.
[89] Trial Tr. 62:18–63:20, 65:12–67:4 (Smith); JX 77, at 3.
[90] Trial Tr. 62:18–63:20, 65:12–67:4 (Smith); JX 77.
[91] Trial Tr. 62:18–64:1, 64:17–67:4 (Smith).

each year after 2013, despite PGI's promise in marketing materials provided to clients that it would undertake no more than three deals per year.[92]

Ketcham formulated firm-wide projections for Promontory in March 2012, his projections for PGI relied solely on Smith's projections for PGI, as described above.[93] The March 2012 projections were provided to, at least, Evercore, Inc. in connection to Promontory's exploration of strategic alternatives.[94]

Promontory updated its long term projections for PGI in February 2013.[95] Contrary to the assumptions in Smith's original 2012 projections, PGI had not achieved any projects since the Bank of America project ended in April 2012. Promontory created the February 2013 projections for PGI by simply shifting expected deals and revenue in the 2012 projections out one year; in other words, the number of deals and revenue expected in 2013 was shifted to 2014, and 2014 was shifted to 2015, and so on.[96] Promontory predicted PGI would perform two deals in 2013.[97] Ketcham forwarded the updated February 2013 projections to Smith.[98]

---

[92] *See, e.g.*, JX 79, at 6 (A presentation prepared in February 2012 for a client meeting noting: "No more than 3 projects a year").
[93] Trial Tr. 562:20–563:18 (Ketcham); JX 78, at 1; JX 81, at 1.
[94] Trial Tr. 302:22–303:3, 442:10–23 (Ludwig); JX 75.
[95] JX 115, JX 118.
[96] Trial Tr. 584:4–8 (Meschke); JX 77; JX 110; JX 118.
[97] JX 118, at 8.
[98] *Id.* at 1.

*D. The Debt/Equity Deal*

By April 2013, PGI still had not received any new projects, despite some close misses.[99]  In early May 2013, Moses and Smith spoke again about PGI's debt to Promontory.[100]  As Smith (through NTS) owned a fifty percent economic interest in PGI, he was responsible for fifty percent of its outstanding debt.[101]  Smith told Moses that Smith had a strong idiosyncratic aversion to investing money back into PGI that had been distributed to him.[102]  Smith also claimed to have a liquidity issue at the time, as he had recently bought two properties for roughly $25 million in cash.[103]  Accordingly, at an in-person meeting with Moses on May 7, 2013, Smith proposed that Promontory write off Smith's portion of PGI's debt in return for Smith reducing his economic interest from fifty percent to thirty percent.[104]

Smith followed his oral proposal with a May 13, 2013 e-mail describing the proposal (the "Debt/Equity Deal"):

> 1. [Promontory] writes off our current loan to PGI so that we start fresh . . .
> 2. PGI funds working capital from its own account until it runs out . . .
> 3. On September 30, you take a view whether or not [Promontory] funds working capital going forward.
> . . .

[99] *See, e.g.*, Trial Tr. 234:14–240:18 (Smith).
[100] *Id.* at 73:3–9 (Smith); *id.* at 498:9–498:14 (Moses).
[101] *See, e.g.*, *id.* at 96:14–17, 98:12–15 (Smith); JX 187 ("I will be responsible for 50% of PGI's debt to Promontory . . . .").
[102] Trial Tr. 498:9–499:1 (Moses); JX 214, at 2.
[103] Trial Tr. 198:4–23, 242:11–243:3 (Smith).
[104] *Id.* at 73:3–9, 75:22–77:4, 242:3–243:7 (Smith); JX 143, at 1.

5. My Share of PGI reduces from 50% to 30%[105]

Smith also wrote:

> I readily acknowledge this is a great deal for [Promontory] but I am willing to accept this deal because I am not in a position to recapitalise [sic] PGI. You are writing off around $3.25 mm of my debt for 20% of PGI which puts a value on PGI of just $16.25mm with me still in place. This is clearly absurd for a business which made $112mm in pretax profit last year and $22mm pretax the year before but I am willing to do this because of the unique circumstances I find myself in.[106]

Smith conditioned his written e-mail proposal on Ludwig's consent,[107] and on Smith "discuss[ing] [the proposal] with [his] tax accountant *before we finally agree to it*."[108]  Moses responded to Smith on May 14, 2013, writing that the proposal "looks right to me."[109]

Moses reached out to Promontory's tax counsel regarding the Debt/Equity Deal, and on May 20, 2013, Moses forwarded to Smith a summary of Promontory's tax counsel's opinion.[110]  On May 20, 2013, Moses also relayed to Smith that Ludwig had agreed to the proposal.[111]  Smith, however, wanted to speak with Promontory's tax counsel directly, or have his tax accountant do so, before agreeing to the deal.[112]

---

[105] JX 143, at 1.
[106] *Id.*
[107] *Id.* ("You have not discussed this with [Ludwig] and you need to see if this makes sense to him.").
[108] *Id.* (emphasis added).  In Smith's words, "I just want to make sure I won't accidentally create a tax liability for myself!"  *Id.*
[109] JX 145, at 1.
[110] *See* JX 151.
[111] JX 153, at 1.
[112] JX 151; JX 158.

On June 11, 2013, Promontory's tax counsel reported to Moses and Smith that he had spoken with Smith's tax accountant and "[Promontory's tax counsel thought they were] in agreement that debt restructuring below should be without income tax consequences . . . ."[113]

On July 2, 2013, Moses asked Smith, via e-mail, whether they "could go ahead with the restructuring of PGI . . . ?"[114]  Moses noted in the e-mail that Ludwig had given his consent and Promontory's tax counsel had also given his tax opinion to Smith.[115]  Moses further wrote: "[W]e need to decide.  [Promontory] has been funding PGI per our oral understding [sic] but if that doesn't work for you, we need to true up the books."[116]  Smith responded by e-mail on the same day and advised Moses that Smith was seeking legal advice and would "get back to [Moses] when [Smith] h[ad] done so."[117]

Moses sent another e-mail to Smith on July 16, 2013, in which Moses wrote that "we are getting close to crunch time" and advised Smith that "I am willing to proceed on the basis of your May 13 email but if you or David [(Smith's legal counsel)] thinks [sic] we should have further documentation, let me know."[118]  In the e-mail, Moses reiterated that Ludwig had agreed to the Debt/Equity Deal and

---

[113] JX 163, at 1.
[114] JX 168.
[115] *Id.*; *see also* JX 151; JX 163; JX 158.
[116] JX 168.
[117] JX 169.
[118] JX 173.

that Promontory's tax counsel had provided an opinion.[119]  Moses also noted that as of June 30, 2013, Promontory had "advanced $6.7 million to PGI's account, and that PGI ha[d] about $1.4 million in its account."[120]

Smith substantively responded to Moses's July 2 and July 16, 2013 e-mails on July 27, 2013.[121]  In an e-mail to Moses, Smith wrote that after consulting with his legal counsel, Smith was advised "that the proposed deal makes little sense from [Smith's] perspective, because it considerably undervalues PGI."[122]  Smith wrote that "we should shelve this proposal" and that he "will be responsible for 50% of PGI's debt to Promontory, which will be paid back when our next deal hits."[123]

*E. Smith Leaves PGI*

Moses responded to Smith's "shelving" of the Debt/Equity Deal by e-mail on July 31, 2013.[124]  Moses wrote to Smith that the proposal "was [*Smith's*] proposal," and that the accounts should have been balanced back in May 2012 but for Smith's "aversion to coming out of pocket returning to PGI moneys that should not have been disbursed to either [Promontory] or [Smith]."[125]  Moses added that going

---

[119] JX 173.
[120] *Id.*
[121] JX 187.
[122] *Id.*
[123] *Id.*
[124] JX 191.
[125] *Id.* (emphasis in original).

forward, he saw "no reason for [Promontory]'s carrying 100% of the load until PGI could repay [Promontory]," and that "[w]e are regressing."[126]

Moses, in further response to Smith's withdrawal of the Debt/Equity Deal, suggested to Ketcham that he should to send an e-mail to Smith telling Smith that Promontory would no longer advance operating expenses to PGI, and instead, PGI expenditures after August 31, 2013, would need to be pre-approved by Moses.[127] Ketcham accordingly sent Smith an e-mail on August 13, 2013, in which Ketcham wrote:

> PGI's cash balance was $1.3M and its payable to [Promontory] totaled $6.7M. Until the capitalization of PGI is resolved, [Promontory] will not make further advances to PGI. Additionally, I have been instructed to not make payments from PGI's bank account after August 31st without prior authorization from [Moses].[128]

Smith responded by tendering his resignation and withdrawal from PGI on August 18, 2013.[129]

In an e-mail to Moses on August 18, 2013, Smith wrote that he was "unable to operate as the CEO of PGI in an environment where [he has] no control over how [PGI's] funds are spent."[130] Smith advised that he was "exercising [his] option under our agreement to voluntarily withdraw from the Joint Venture and to receive from

---

[126] Id.
[127] Trial Tr. 447:23–448:8, 463:15–464:7 (Ludwig); id. at 510:6–511:19, 543:17–544:2 (Moses); JX 202.
[128] JX 202.
[129] JX 208.
[130] Id.

18

[Ludwig] 50% of the current going business value of the JV, minus my services."[131] Smith's withdrawal was "effective immediately."[132] However, Smith wanted to leave in a manner that would preserve the value of the business, and he expressed a willingness to continue in his role and work with any replacement CEO.[133]

Smith denies that he met with Moses after sending his withdrawal e-mail;[134] however, Moses sent to Ludwig his notes of a purported meeting with Smith on August 19, 2013.[135] In short, Moses wrote that Smith seemed set on leaving.[136] In another e-mail on August 20, Moses recommended to Ludwig that they let Smith leave immediately and move on, potentially even without PGI generally.[137] Ludwig agreed with Moses on moving on from Smith, but felt that PGI should continue as a business.[138]

The parties agree that on August 18, 2013, Smith resigned from his positions at PGI via the e-mail sent to Moses,[139] and in the same e-mail Smith (on behalf of NTS) withdrew, effective immediately, as a member of PGI.[140] The parties further agree that, as PGI's first engagement was in April 2010, Smith's withdrawal in

---

[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] Trial Tr. 660:23–661:5 (Smith).
[135] JX 210.
[136] *Id.*
[137] JX 214.
[138] *Id.*
[139] PTO ¶ 30.
[140] *Id.*

August 2013 was more than three years after PGI's first engagement.[141] Smith and Promontory did not agree to a valuation of "the then going business value of [PGI] minus [Smith's] services" on August 18, or any date thereafter, as required by the Letter of Intent.[142] Smith does admit that as of the time he left PGI on August 18, 2019 he owed to PGI half of its then outstanding debt to Promontory, which he believed amounts to approximately $2.9 million.[143]

*F. PGI Without Smith*

### 1. PGI's Accounting for Smith's Departure

PGI created monthly financial statements for June 2013 through October 2013, which detailed, among other things, the debt PGI owed to Promontory.[144] These records did *not* reflect a reduction in the debt PGI owed to Promontory, which would have been consistent with consummation of the Debt/Equity Deal to write off Smith's portion of PGI's debt in return for his ceding to Promontory twenty percent of PGI's equity.[145] In 2014, however, when Promontory worked with KPMG to produce audited financial statements for 2013, Promontory represented to KPMG that the Debt/Equity Deal had been consummated on May 31, 2013, and furthermore, that Smith had withdrawn from PGI for no consideration.[146]

---

[141] *Id.* ¶ 32.
[142] *Id.* ¶ 31.
[143] *See, e.g.*, Trial Tr. 96:14–17, 158:1–6 (Smith).
[144] *See, e.g.*, JX 207, at 4.
[145] *See, e.g.*, JX 207, at 4; JX 231, at 4; JX 240, at 4; JX 246, at 14; JX 249, at 17.
[146] JX 297, at 8.

## 2. PGI's Long Term Projections

In July 2013, Promontory again updated its financial projections, it now predicted zero revenue for PGI in 2013, and restated its projections by again simply pushing out the original 2012 projections to yet another year; in other words, the three deals predicted for 2013, which had been pushed to 2014, were now anticipated to be acquired in 2015.[147] The July 2013 projections predicted one deal in 2013 and two in 2014.[148] In August 2013, Promontory again created financial projections; the number and timing of deals for PGI remained the same as the July 2013 projections.[149] Promontory sent some version of their long term projections prepared in 2013 to Eagle Bank, M&T Bank and Suntrust.[150]

## 3. PGI's Business Efforts after Smith's Departure

When Smith left, PGI had other employees, including five managing directors with consulting experience.[151] In a message to PGI staff, Ludwig expressed confidence in PGI's ability to succeed, post-Smith.[152] PGI continued to operate for a time without Smith and succeeded in generating two projects, one in 2014 and one

---

[147] JX 186; *see also* JX 77; JX 118.
[148] JX 186, at 21.
[149] *See* JX 213, at 14; JX 186, at 21.
[150] JX 155; JX 146; JX 257. Promontory had some sort of banking relationship (or was considering entering into a banking relationship) with these entities. Trial Tr. 587:13–593:12, 598:4–600:2 (Meschke).
[151] Trial Tr. 51:15–57:12 (Smith); JX 345 at 7–10 (identifying five managing directors).
[152] Trial Tr. 364:16–369:5 (Ludwig); JX 216; *see also* JX 215 ("talented team"); JX 251 ("My sense is that the cost saving process business should be able to scale and operate at about 3 times its current size over the next 2 ish years . . . .").

in 2015.[153]  The two projects brought in over $12 million in revenue for PGI.[154]

Ultimately, PGI ceased operations in mid-2016.[155]

*G. Expert Reports on Valuation*

The parties have both submitted expert reports and testimony on the valuation of "the then going business value of [PGI] minus [Smith's] services" on August 18, 2018.[156]

1. Clarke's Valuation

The Plaintiffs' expert, David G. Clarke, used a discounted cash flow ("DCF") analysis to arrive at a value of PGI without Smith of $37.5 million as of August 18, 2013.[157]  Because the Plaintiffs contend that the Debt/Equity Deal was never consummated, they argue that half of the $37.5 million is owed to Smith. Accordingly, Clarke concludes that Smith's interest in PGI is worth $18.75 million.[158] Clarke arrived at this valuation using Promontory's long term projections for PGI prepared in August 2013 (which were functionally the same as the projections created in July 2013)[159] as a basis for his DCF, then reducing the revenue projections by one half to account for the loss of Smith.[160]  Clarke also conducted a

---

[153] Trial Tr. 295:2–14 (Ludwig); JX 328, at 1; JX 346, at 4.
[154] JX 328, at 1; JX 346, at 4.
[155] Trial Tr. 395:9–14 (Ludwig); *id.* at 521:12–522:1 (Moses).
[156] JX 16, at 4.
[157] JX 1, at 3.
[158] *Id.* at 1.
[159] JX 186; JX 213; JX 1, at 19 n.49; *see also* Trial Tr. 671:17–22 (Clarke).
[160] JX 1, at 1; *see also id.* at 19–27.

valuation based on the Debt/Equity Deal, with some adjustments, as a check on his DCF analysis.[161]

### 2. Schweihs's Valuation

The Defendants' expert, Robert P. Schweihs, used the asset accumulation method to value PGI, and arrived at a valuation on August 18, 2013, without Smith, of $0.[162] The Defendants contend that the Debt/Equity Deal reduced Smith's interest in PGI to 30%; in any event, whether fifty percent or thirty percent, Smith's share of $0 is $0, per Defendants.[163] Schweihs attempted to value PGI's intangible assets as of August 18, 2013, including assembled workforce and goodwill, but found that only the assembled workforce had any value.[164] Schweihs, using book value as a proxy for fair market value, determined that the fair market value of PGI's liabilities exceeded the fair market value of its tangible assets (and its intangible assets) on August 18, 2013, and concluded that PGI had no value on that date.[165]

*H. Procedural History*

Plaintiffs Smith and NTS filed their Complaint on July 7, 2015. Defendants Promontory and PGI filed their Answer and Counterclaim on August 4, 2015. The parties attempted to resolve this matter through mediation in May 2016, but were

---

[161] *Id.* at 41–47.
[162] JX 2, at 29.
[163] *Id.*, at 3.
[164] *Id.*, at 29.
[165] *Id.*

unsuccessful. A three-day trial took place from September 24, 2018 to September 26, 2018. I heard post-trial Oral Argument on December 6, 2018. While the matter was pending decision, the parties made additional submissions via letters on January 1, 2019 and January 9, 2019. Thereafter, I considered the matter submitted as of January 9, 2019.

## II. LEGAL ANALYSIS

The Plaintiffs ask, pursuant to 6 Del. C. § 18-111,[166] that this Court interpret and enforce the provisions of PGI's governing document; the Letter of Intent. Specifically, the Plaintiffs ask that I determine the "then going business value of [PGI] minus [Smith's] services" as of August 18, 2013.[167] The Plaintiffs ask that I award them fifty percent of that value, payable by Promontory. The Defendants contest that any amount would be payable by Promontory rather than PGI. Furthermore, the Defendants argue that the Debt/Equity Deal referenced above was accepted and that the Plaintiffs are only entitled to thirty percent of any amount of the value of PGI, without Smith, on August 18, 2013. The Defendants also filed a counterclaim, in which they ask that I require Smith to cure his negative capital account in PGI. As an initial matter, the burden of proof lies with the party seeking

---

[166] According to 6 Del. C. § 18-111, "[a]ny action to interpret, apply or enforce the provisions of a limited liability company agreement . . . may be brought in the Court of Chancery."
[167] JX 16, at 4.

relief, and the burden at trial is a preponderance of the evidence. I start my analysis with whether the Debt/Equity Deal was consummated.

*A. The Debt/Equity Deal*

To be binding, a contract must represent a meeting of the minds of the parties. This meeting of the minds is represented by an offer to be bound, an acceptance of the offer, and consideration.[168] Here, the offer, per the parties, was conditional; they argue over whether the conditions were met before the offer was withdrawn. More fundamentally, it appears to me, an offer subject to acceptance was in fact never made; Smith proposed terms, and stated conditions which must be met before the parties reached a binding agreement. In either event, no binding contract was reached, and the parties' own behavior indicates that they understood that the Debt/Equity Deal was unconsummated.

On May 13, 2013, Smith sent Moses a written proposal, under which Promontory would forgive all of PGI's debt, and in return Smith would cede to Promontory a twenty percent interest in PGI. However, Smith's offer was conditional, and he explicitly withheld his "final agreement" to the Debt/Equity Deal

---

[168] *See, e.g.*, *Hunter v. Diocese of Wilmington*, 1987 WL 15555, at *4 (Del. Ch. Aug. 4, 1987) ("For this characterization, 'contract,' to be placed properly upon behavior, under conventional legal learning, there should be (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act.") (internal citations omitted).

until after the conditions were satisfied.[169] The stated conditions were Ludwig's approval, and Smith's ability to seek tax advice and assurance that the Debt/Equity Deal would create no personal tax liability for him. I note that if this had been an offer via which (after satisfaction of the tax issue) the Defendants could have bound Smith through acceptance, the "condition" of Ludwig's—the counterparty's— acceptance of the offer would be surplussage. In any event, Ludwig promptly provided his approval. However, Smith—despite speaking with his tax accountant and having his tax accountant speak with Promontory's tax counsel—never told Moses that he was satisfied that there would be no personal tax liability, and that he wished to proceed. Smith never conveyed that he agreed to be bound to the terms he had proposed. While Promontory's own tax counsel advised Smith that Smith would have no personal tax liability, Smith never conveyed to Moses that this was sufficient to obtain Smith's agreement. Moses repeatedly asked Smith for *Smith's* permission to proceed (or, in the alternative, to abandon the Debt/Equity Deal and true up PGI's accounts), which indicates that Moses was aware that Smith had not yet agreed to be bound. Ultimately, I find, the Defendants concluded that Smith would not agree to the Debt/Equity Deal; as a consequence, they put spending restrictions on PGI that convinced Smith to resign and withdraw from the company.

---

[169] JX 143, at 1 (". . . before we finally agree to it . . . .").

The Defendants have now taken the position that an agreement was reached because, according to them, Smith's conditions on the Debt/Equity Deal had been met. However, the evidence does not support that Smith ever agreed to be bound. I find the Defendants were aware that the Debt/Equity Deal was unconsummated, a finding bolstered by the fact that Promontory did not record the execution of the Debt/Equity Deal in PGI's contemporaneous monthly financial statements.[170] Therefore, Smith, prior to withdrawing from PGI on August 18, 2013, retained a fifty percent economic interest in PGI.

*B. PGI's Business Value Without Smith*

The parties agree that Smith voluntarily withdrew from PGI on August 18, 2013. The parties also agree that this date was more than three years after PGI's first engagement, and therefore, pursuant to the Letter of Intent, Smith was entitled to receive "over a period not to exceed 5 years 50% of the then going business value of [PGI] minus [Smith's] services, the value to be decided between the parties at the time thereof."[171] I have found that Smith and Promontory did not come to an agreement on the Debt/Equity Deal, and therefore Smith continued to be entitled to fifty percent of the business value of PGI (as opposed to thirty percent if the proposal

---

[170] Promontory did include the transaction in its audited annual financial statements for 2013, prepared in 2014. However, Promontory represented that the Debt/Equity Deal was in place by May 31, 2013, before Promontory's tax counsel reported that he had spoken to Smith's tax accountant in June, and at a time when even the Defendants do not contend an enforceable bargain had been struck.

[171] PTO ¶¶ 31, 32.

had been consummated). However, at the time Smith voluntarily withdrew from PGI, the parties did not agree on what the business value of PGI, without Smith, was. Both sides agree that this value must, therefore, be supplied by the Court. To find PGI's business value without Smith, the Plaintiffs primarily argue that I should rely on their DCF analysis, based on long-term projections for PGI prepared in August 2013. Alternatively, the Plaintiffs suggest that a prior transaction, the Debt/Equity Deal, could also be used, with adjustments, to value PGI. The Defendants argue that an asset pricing method (the asset accumulation method) should be applied. I start first with the asset accumulation method.

### 1. Asset Accumulation Method

The Defendants argue that an asset accumulation method to valuation should be applied to PGI as of August 18, 2013. The Defendants' expert assigned, or attempted to assign, fair value to PGI's assets and liabilities as of August 18, 2013, and concluded that PGI had a value of zero because it had more liabilities than assets.[172] PGI's business was to provide consulting services; it had few tangible assets. Its primary assets were intangible, such as its workforce and its goodwill. The Defendants' expert valued PGI's workforce at cost and found that various goodwill assets either did not belong to PGI or had no value. On the other hand,

---

[172] JX 2, at 24–29; *id.* at 29 ("[B]ased on the asset accumulation method as described herein, the fair market value of the equity of PGI is zero as of August 18, 2013.").

PGI had a large amount of liabilities, mostly its debt to Promontory. As a result, the Defendants' expert, after netting PGI's assets and liabilities, concluded PGI had no value.

An asset approach is inappropriate to value PGI. PGI's sole business was provision of professional services; it understandably had few tangible assets. Its value was largely attributable to its intangible assets, which are difficult to value. An asset approach for a viable services business, like PGI, would tend to undervalue such a business. The problem was exacerbated here by the episodic nature of PGI's hunter/gatherer business model; the primary flaw of an asset approach, in this circumstance, is its inadequacy to value PGI's prospects. An example is readily supplied by consideration of an application of the asset accumulation method, as applied by the Defendants' expert, to value PGI just *before* the Bank of America deal in 2011 (instead of, as here, in August 2013). PGI in 2011 was, as in 2013, a company without substantial tangible assets, and was considerably indebted to Promontory, with several million dollars of debt outstanding.[173] In the months leading up to the Bank of America deal, applying the Defendant's asset accumulation method would have resulted in a value for PGI of zero (or close to it— PGI, at that point, would still have had Smith, who theoretically would have added some value to PGI's intangible assets). Such a valuation performed on PGI in April

---

[173] *See, e.g.*, JX 60, at 2 (PGI owed Promontory almost $4 million as of December 31, 2010).

2011 would have missed the $120 million in profits received by PGI over the following twelve months.

I find that the asset accumulation method is not the proper tool to value PGI.

### 2. Discounted Cash Flow

The Plaintiffs are similarly inapt in proposing a DCF to value PGI. Generally speaking, PGI's business did not lend itself to a DCF. PGI's cash flows were erratic and sparse; it did three deals in four years under Smith, one with revenue of less than one million dollars, a second with revenue around five million dollars, and a third with revenue over one hundred thirty million dollars. Smith readily admitted that finding business was like finding a needle in a haystack. Such boom or bust economics do not produce a reliable DCF analysis.[174]

Not only is a DCF generally a poor method to value a company like PGI, but, I find, the Plaintiff's expert relied on spurious projections of cash flows that make his DCF unreliable. The Plaintiffs used Promontory's long term projections of PGI created in August 2013. Those August 2013 projections were effectively stale versions of Promontory's projections created in March 2012. The March 2012

---

[174] *See Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *7 (Del. Ch. May 20, 2004) ("The goal of the DCF method of valuation is to value future cash flows. Here, the record clearly shows that, in the absence of reasonably reliable contemporaneous projections, the degree of speculation and uncertainty characterizing the future prospects of Travelocity and the industry in which it operates make a DCF analysis of marginal utility as a valuation technique in this case."); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *10 (Del. Ch. Nov. 1, 2013) ("[M]anagement had prepared a set of uncertain and therefore unreliable financial projections."), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE).

projections had proved to be inaccurate, because (contra the projections) PGI *had generated no business.* Thereafter, the projections were updated with pig-headed consistency; Promontory merely shifted (copied-and-pasted) projections out for another year, a methodology that is as remarkable for its simplicity as it is dubious. By August 2013, the original number of deals projected for 2013, as forecast in the March 2012 projections, *had simply been moved out to 2015.* There is no evidence that the underlying assumptions for the March 2012 projections were revisited when those projections were updated. Furthermore, I note, the initial March 2012 projections were based entirely on Smith's guidance. In 2012, Smith had no prior experience creating long term projections. He based his assumptions not on his experience at PGI, but from his experience at two previous consulting firms. When it came to the predicted number of deals per year, Smith's projections actually exceeded the maximum of deals per year provided by PGI to prospective clients, which were limited to three per year as a marketing tool. Given the method and manner in which the projections were originally prepared and then updated, I have no confidence in their reliability for valuation purposes.[175]

---

[175] *See, e.g.*, *Long Path Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *10 ("In fact, management projections can be, and have been, rejected entirely when they lack sufficient indicia of reliability, such as when they were prepared . . . by a management team that never before had created long-term projections.") (citing *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *4 (Del. Ch. Apr. 30, 2012)).

The Plaintiffs contend that because the long term projections prepared by Promontory were sent to various banks and financial institutions, the Defendants should not now be heard to refute them.[176]  However, I do not find that the fact that the projections were shared adds credence to their reliability here.  PGI's business model and operating history show that a DCF was generally an inappropriate method to value PGI.  Furthermore, the long term projections for PGI, on which the Defendants' DCF was based, were not created with care and are not a reliable basis for valuation.  As a result, I do not find that the Plaintiffs' DCF is a proper valuation of PGI.

### 3. PGI's Business Value (with Smith) in the Debt/Equity Deal

The Plaintiffs suggest one other valuation method, relying on a past transaction, in this case the Debt/Equity Deal.  The Plaintiffs made several adjustments to the Debt/Equity Deal to arrive at a value for PGI.  As explained below, I find these proposed adjustments unnecessary.  The Debt/Equity Deal is the best indicator of PGI's value, with Smith at the helm.  Smith made the initial proposal in the Debt/Equity Deal and explicitly noted that his proposal valued PGI

---

[176] There is considerable confusion on the purpose of the long term projections and Promontory's exact relationship with the institutions to which it ultimately sent the projections.  Nonetheless, the fact that Promontory sent unreliable projections for PGI to others does not make those projections reliable now.  *See, e.g.*, *Doft & Co.*, 2004 WL 1152338, at *6 (rejecting reliance on management projections despite the fact they were provided to others).  To the extent that the Plaintiffs argue that, having sent these projections to third parties, the Defendants should be estopped in equity from denying them, I find that, having himself created these inaccurate projections, it would be inequitable to allow Smith to profit from them here.

at $16.25 million (with Smith). Ludwig agreed to the proposal. The Debt/Equity Deal was initially delayed to satisfy Smith's tax concerns. While Smith later claimed the Debt/Equity Deal undervalued PGI, it represents the best evidence of PGI's value with Smith in place.

The Plaintiffs argue that the valuation of PGI reflected in the Debt/Equity deal must be adjusted to account for change of control and lack of marketability. However, both sides agreed to the valuation in principle, and there is no indication in the record that this valuation included discounts for control and marketability.[177] Moreover, the Letter of Intent refers to a valuation *as agreed to by the parties*; the Debt/Equity Deal is such an agreement, near-contemporaneous with Smith's withdrawal.

The Plaintiffs also argue that the Debt/Equity Deal was made under duress or was in some respect a fire sale. The Plaintiffs argue that the Defendants "jumped" on the proposal, with their eagerness indicating its unfairness to Smith. However, there is another, more rational explanation: Ludwig and Moses wanted to resolve PGI's capital problems *and* wanted to keep Smith around and happy. The record, moreover, reflects no "duress" on Smith's part. The Debt/Equity Deal was the result

[177] The Plaintiffs also indicated that the valuation of $16.25 implied by the Debt/Equity Deal is intrinsically too low because PGI made over $120 million in pre-tax profit in 2011 and 2012 combined. However, PGI did not expect to do another deal of the size of Bank of America again. *See* Trial Tr. 36:12–13 (Smith) (describing the Bank of America deal as a "dream assignment").

of a longstanding discussion between Smith and Moses about repaying PGI's debt to Promontory. Smith was aware of his large, negative capital account as far back as early 2013. Smith declined to contribute capital to PGI at that time in the hopes that PGI would be able to win a deal and pay off its debt to Promontory, instead of Smith coming out of pocket himself. PGI, as it turned out, was unable to win any deals in the interim; this, however, does not indicate that Smith was under duress at the time he proposed the Debt/Equity Deal. Discussions about the Debt/Equity Deal continued for several weeks after Smith's initial proposal in early May 2013, and it was Smith who withdrew the proposal in July 2013, which undercuts the idea that his proposal implicated financial duress. While Smith told Moses that Smith was strangely averse to reinvesting his overdrawn funds back into PGI, this personal idiosyncrasy also does not amount to duress.

At trial, Smith explained he was facing liquidity issues at the time, having just purchased two properties for $25 million in cash. Smith, however, had received *more* than $25 million in distributions from PGI over the last two years, and furthermore, he did not indicate what, if anything, prevented him from leveraging his properties to contribute capital to PGI. I do not find that Smith was under the type of duress that would make me question the valuation implied by the Debt/Equity Deal. Smith points to his contemporaneous writings, which state that due to circumstances, he was willing to accept less than full value. There is, of

course, another explanation for this than actual duress: that Smith's poor-mouthing and complaint of undervaluation were bargaining tactics.

The Debt/Equity Deal is the best indication of the value of PGI around August 18, 2013. Smith himself proposed it, and Ludwig agreed to it. While, at the time, Smith noted he believed it was an undervaluation of PGI, he was still willing to accept it (assuming certain conditions, which were not met). The Plaintiffs' attempts now to cast doubt on the Debt/Equity Deal, without adjustments, as proof of value fall flat. The Debt/Equity Deal represents the valuation of both parties at the time, and I therefore find that PGI's business value *with Smith* was $16.25 million.[178]

### 4. PGI's Business Value Without Smith

The Letter of Intent provides that Smith is entitled to fifty percent of PGI's business value *without* Smith's services. PGI's business value on August 18, 2013, with Smith was $16.25 million. The Plaintiffs' expert opined that a reduction of one-half of entity value was appropriate to account for Smith's departure; I agree. I find that PGI's business value without Smith was $8.125 million. Smith and Ludwig formed PGI as equal economic partners, each had a fifty percent interest. Smith and Ludwig both brought unique attributes to the table. Smith had experience in the

---

[178] The Defendants note that the Plaintiffs' own expert stated that the Debt/Equity Deal was not an arm's length transaction; therefore, the Defendants argue that its use as a valuation method is inappropriate. I note, however, that the Letter of Intent itself refers to a value as agreed to by the parties, and not some other valuation method. Furthermore, Smith and Moses negotiated the Debt/Equity Deal. There is no indication that they were not acting in their (and their entities') own interests. Again, neither party was negotiating under duress.

profit improvement field and Ludwig had important connections to potential clients. It is reasonable to believe that they decided to share the economic interest in PGI equally because they viewed their contribution to PGI to be equal.

Nonetheless, the Defendants argue that Smith's departure reduced PGI's value by more than fifty percent. The Defendants rely, in part, on an implication from Plaintiffs' DCF analysis, however, for the reasons stated above, I have not relied on that analysis. The Defendants also argue that Smith was integral to the business and that the value of PGI necessarily fell by more than fifty percent without Smith because Smith and Ludwig performed different, complimentary and essential, functions. Per the Defendants, Ludwig was valuable in combination with Smith, but without Smith, Ludwig's entre into the business world lost much of that value, because Smith's departure left no one to perform the underlying work. However, PGI had a team of five managing directors. While they may not have had Smith's reputation, they were nonetheless capable of pitching clients and performing PGI's process (and, in fact, did so with some success). Ludwig certainly believed the PGI business was viable, as he continued to support it, post-Smith. I find that PGI retained half its value, post-Smith.

PGI's business value, without Smith, on August 18, 2013 was therefore $8.125 million.[179] The Letter of Intent promises fifty percent of that value to Smith.

---

[179] Again, this is half of PGI's value with Smith, $16.25 million.

Therefore, according to the Letter of Intent the Plaintiffs are owed $4,062,500. This judgment, however, must be reduced by the Defendants' counterclaim, which I turn to next.

### C. Promontory's Counter-Claim

The Defendants asserted a counterclaim to recover the money Smith owes, to PGI to settle his negative capital account as of August 18, 2013. Smith does not dispute that he owes some amount; he estimated he owes $2.9 million to account for his half of PGI's debt to Promontory. I find that, as of August 18, 2013, PGI's debt to Promontory, offset by cash on hand and reduced by 50% to reflect Smith's share, was $2,930,149.[180] Smith owed an additional $203,035 because his capital account was overdrawn by this amount, representing monthly distributions he received from PGI.[181] Therefore, Smith owes, in total, $3,133,184 to cure his negative capital account at PGI.[182]

---

[180] I note that the Plaintiffs submitted a supplemental letter after trial, in which they calculated Smith's portion of PGI's debt to Promontory to actually be greater than this, at $2,943,903.22. *See* D.I. 77.

[181] Trial Tr. 627:9-13 (Sherman).

[182] The Defendants presented evidence to support this amount at trial. *See, e.g.*, JX 344; Trial Tr. 624:13–649:6 (Sherman). At Post-Trial Oral Argument, the Plaintiffs conceded that this amount was accurate. Post-Trial Oral Argument Tr. 91:23–93:3. The Plaintiffs thereafter submitted a letter contesting the accuracy of this amount. D.I. 77. I note that the Plaintiffs' argument in their supplemental letter fails to account for the amount that Smith owed PGI *in addition* to his half of PGI's debt to Promontory.

*D. The Judgement Amount*

There are, unfortunately, issues that must be resolved before a final order. Smith seeks prejudgment interest. The payment upon voluntary withdrawal was payable to Smith within five years, per the Letter of Intent. This raises the question of when interest began to accrue. The Defendants also seek interest on their counterclaim for cure of Smith's negative capital account, but have not suggested the date at which that interest should accrue. Finally, the parties disagree as to whether Promontory or PGI is obligated to pay Smith under the Letter of Intent. After Smith withdrew from PGI on August 18, 2013, Promontory became the sole member of PGI. In light of that fact, whether PGI or Promontory is liable according to the Letter of Intent does not appear material, but the parties should inform me if this distinction needs further resolution, in light of my decision here.

## III. CONCLUSION

The Plaintiffs attempted to settle their liability to PGI for PGI's debt to Promontory through the Debt/Equity Deal. The proposal was not consummated, therefore Smith retained a fifty percent economic interest in PGI when he voluntarily withdrew from PGI on August 18, 2013. Pursuant to the Letter of Intent, PGI's business value without Smith on August 18, 2013 was $8.125 million, and Smith is owed $4,062,500. However, Smith must contribute $3,133,184 to settle the negative capital account he left behind when he withdrew from Promontory. Interest remains

to be calculated. The Parties should confer and inform me promptly what further proceedings are necessary.